Argued and submitted January 10, 1995; reassigned July 8, decision of the Court of Appeals affirmed; judgment of the circuit court remanded in part; otherwise affirmed October 11, 1996

# STATE OF OREGON,
*Respondent on Review,*

*v.*

# ROBERT WALLACE LYONS,
*Petitioner on Review.*

## (CC 10-89-08273; CA A68348; SC S41261)

924 P2d 802

Sally L. Avera, Public Defender, Salem, argued the cause on behalf of petitioner on review. With her on the petition was David K. Allen, Deputy Public Defender.

Janet A. Klapstein, Assistant Attorney General, Salem, argued the cause on behalf of respondent on review. With her on the brief were Theodore R. Kulongoski, Attorney General, and Virginia L. Linder, Solicitor General.

Before, Carson, Chief Justice, and Gillette, Van Hoomissen, Fadeley, Graber, and Durham, Justices.**

VAN HOOMISSEN, J.

---

** Unis, J., retired June 30, 1996, and did not participate in this decision.

## VAN HOOMISSEN, J.

Defendant appeals his convictions for aggravated murder, murder, and burglary in the first degree. ORS 163.095; ORS 163.115; ORS 164.225. He contends that the trial court erred by admitting the state's polymerase chain reaction (PCR)-based deoxyribonucleic acid (DNA) evidence and in failing to disclose to the defense nonexculpatory material contained in the mental health records of a person who, defendant claims, committed the crimes. The Court of Appeals affirmed. *State v. Lyons*, 124 Or App 598, 863 P2d 1303 (1993). We allowed review to decide an important issue of first impression in this court, namely, the admissibility of PCR-based DNA evidence. For the reasons explained below, we affirm.

### I. FACTS AND PROCEDURAL BACKGROUND

Because a jury convicted defendant, we state the facts in the light most favorable to the state. *See State v. Langley*, 314 Or 247, 249, 839 P2d 692 (1992) (stating principle).

In August 1989, defendant moved to the Stage Stop Inn motel in Eugene. The victim, Stabenow, also lived at the motel. Stabenow's mother, Jones, managed the motel and lived nearby. Stabenow's brother, Elliot, lived at the motel with Stemm, his girlfriend. On September 22, Stabenow joined Elliot and Stemm for dinner in Elliot's room. An hour after dinner, defendant arrived at Elliot's room with a bottle of whiskey. At about 11:30 p.m., Elliot told Stabenow that she had had enough to drink. Stabenow became angry and left. Defendant and Elliot left the motel. At about 2:00 a.m., they returned, and defendant went to his room.

Shortly before noon, defendant asked Stemm if she or Elliot had seen his wallet. He then told Jones that he had left his wallet in Stabenow's room. Jones telephoned Stabenow's room, but there was no answer. At about 3:00 p.m., Jones used her master key to gain entry to Stabenow's room. Stabenow's body was on the bed. Blood was coming from her mouth, and there were bite marks on her body. Jones asked Elliot to call 911 for help. A paramedic arrived, but he could not resuscitate Stabenow. The police found

defendant's wallet under Stabenow's bed. Defendant admitted being in the victim's room on the night of the homicide and dropping his wallet there. However, he denied engaging in sexual activity, biting or killing the victim.

Bekkedahl, an Oregon State Police criminalist, found feces on the victim's legs, on her buttocks, and on the bed. Her clothing was stained with blood, and there were numerous bite marks on her body from her shoulder down to her leg. She had a black eye, and her body was bruised in many places. She had been strangled to death. Bekkedahl removed loose hairs from the victim's body, her clothing, and her bed. He also took saliva samples from the bite marks on the victim's body for testing. Later, while defendant was in custody, samples of his hair were obtained for comparison. Bekkedahl tested the hairs under a microscope. He concluded that the morphology (shape) of five of the hairs taken from the victim's body was consistent with that of defendant's pubic hairs. Bekkedahl tested the saliva sample taken from bite marks on the victim's body. He determined that a person with type-A blood, who secretes A antigen into body fluids other than blood, left the saliva residue in the bite marks. According to Bekkedahl, 32 percent of the population secrete the type-A antigen into body fluids other than blood. Bekkedahl tested a sample of defendant's blood and determined that he is a type-A secretor.

Levine, a forensic odontologist, examined the bite marks on the victim's body. He compared the marks with wax models that had been made from defendant's teeth. He testified that four of the marks on the victim's body could be compared. Levine had no doubt that the wax models were made from the same person whose teeth marks appeared on the victim's body.

Blake, a forensic evidence consultant, conducted PCR-based DNA tests on the hair and saliva samples that had been taken from the victim's body and from defendant, a Caucasian. Blake testified at trial, over defendant's objection, that defendant had the same gene type as the donor of two of the hairs removed from the victim's body and that that gene type occurs in about two to three percent of the Caucasian population. Blake further testified that the victim had a

different gene type. Testing of the saliva samples was inconclusive.

■ The trial court conducted a pre-trial hearing on the admissibility of the state's proffered PCR-based DNA evidence. *See State v. Brown*, 297 Or 404, 687 P2d 751 (1984) (adopting standard for admissibility of scientific evidence).[1] The court stated the question as follows:

> "May the results of a scientific procedure known as 'PCR-based DQ Alpha typing' be admitted to show that the Defendant falls within a limited population which cannot be excluded as the potential donor of certain hair samples found at the scene of the crime."

Six experts testified for the state and one testified for the defense. The court concluded that the state's PCR-based DNA evidence was relevant under OEC 401,[2] helpful to the

---

[1] Oregon courts have followed the *Brown* standard, which we explain more fully below, since 1984. By contrast, many federal and state courts have followed the "general acceptance" standard first articulated in *Frye v. United States*, 293 F 1013 (DC Cir 1923). In those jurisdictions, the proponent of scientific evidence must establish that the underlying theory and methodology are "generally accepted" within the relevant portion of the scientific community.

In *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 US 579, 113 S Ct 2786, 125 L Ed 2d 469 (1993), decided after this court's decision in *Brown*, the United States Supreme Court adopted a new test for admission of scientific evidence in federal courts. The court noted the rigidity of *Frye's* "general acceptance" (*Frye*) test in contrast to the liberal thrust of the Federal Rules of Evidence and their general approach to relaxing the traditional barriers to opinion testimony. *Id.* at 588. In *Daubert*, the Supreme Court explained the "gatekeeper" function of a trial court. The trial court must ensure that scientific testimony or evidence is both relevant and reliable. *Daubert* cautions lower courts not to confuse the role of judge and jury by forgetting that "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof," rather than exclusion "are the traditional and appropriate means of attacking shaky but admissible evidence." *Id.* at 596. In *State v. O'Key*, 321 Or 285, 306-07, 899 P2d 663 (1995), this court considered *Daubert's* analysis and holding, but continued to follow the *Brown* standard under the Oregon Evidence Code. Nonetheless, in *O'Key*, this court stated that, when "[f]aced with a proffer of expert testimony, an Oregon trial court, in performing its vital role as 'gatekeeper' pursuant to OEC 104(1), should * * * find *Daubert* instructive."

[2] OEC 401 provides:

"'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."

OEC 402 provides:

"All relevant evidence is admissible, except as otherwise provided by the Oregon Evidence Code, by the Constitutions of the United States and Oregon,

trier of fact under OEC 702,[3] and not excludable under OEC 403.[4] Accordingly, the court ruled that the evidence was admissible. The Court of Appeals affirmed. Notwithstanding the usual deference to trial court discretion, *State v. O'Key*, 321 Or 285, 320, 899 P2d 663 (1995), we review that ruling on the admissibility of scientific evidence *de novo*.[5] *Id.*; *Plemel v. Walter*, 303 Or 262, 277-78, 735 P2d 1209 (1987); *Brown*, 297 Or at 422.

## II. ADMISSIBILITY OF PCR-BASED DNA EVIDENCE

Defendant contends that the trial court erred by admitting PCR-based DNA evidence. He argues that PCR-based DNA evidence is scientific[6] evidence that does not meet the *Brown* standard of admissibility. Defendant does not challenge the general acceptance of DNA testing.[7] He concedes that generally forensic DNA evidence is admissible, if it

---

or by Oregon statutory or decisional law. Evidence which is not relevant is not admissible."

[3] OEC 702 provides:

"If scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training or education may testify thereto in the form of an opinion or otherwise."

[4] OEC 403 provides:

"Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay or needless presentation of cumulative evidence."

[5] *See* Jay P. Kesan, *An Autopsy of Scientific Evidence in a Post-Daubert World*, 84 Geo LJ 1985, 2036-39 (1996) (arguing that appellate courts should review expert opinion that is based on a particular scientific technique under a *de novo* standard of review).

[6] This court stated in *Brown* that the term "scientific" refers to evidence that draws its convincing force from some principle of science, mathematics, or the like. *Brown*, 297 Or at 407.

[7] The majority of appellate and trial courts that have considered the issue have found the theory of DNA testing to be scientifically valid. Most of the early court cases involved a process known as Restriction Fragment Length Polymorphism (RFLP). *See, e.g., Taylor v. State*, 889 P2d 319 (Okl App 1995) (under *Daubert* standard); *Fishback v. People*, 851 P2d 884 (Colo 1993); *State v. Cauthron*, 120 Wash 2d 879, 846 P2d 502 (1993); *State v. Montalbo*, 73 Haw 130, 828 P2d 1274 (1992); *Rivera v. State*, 840 P2d 933 (Wyo 1992); *Robinson v. State*, 610 So 2d 1288 (Fla 1992); *Polk v. State*, 612 So 2d 381 (Miss 1992); *People v. Axell*, 235 Cal App 3d 836, 1 Cal Rptr 2d 411 (1991), *rev den* (1992); *State v. Brown*, 470 NW2d 30 (Iowa 1991); *Spencer v. Commonwealth*, 240 Va 78, 393 SE2d 609, *cert den* 498 US 908 (1990); *Caldwell v. State*, 260 Ga 278, 393 SE2d 436 (1990); *United States v. Jakobetz*, 747 F Supp 250 (D Vt 1990), *aff'd* 955 F2d 786 (2d Cir 1992), *cert den* 506 US 834; *Cobey v. State*, 80 Md App 31, 559 A2d 391 (1989); *Andrews v. State*, 533 So 2d 841 (Fla

is supported by an adequate evidential base.[8] Defendant also concedes that the PCR method is generally accepted among scientists. Rather, he argues only that the reliability of the PCR method has not been established for *forensic* purposes. During oral argument in this court, defendant's counsel stated:

> "The theoretical science behind the identification of DNA by Alpha Gene and PCR method is not challenged. The theory is fine. It's the *forensic* application that [is] the problem." (Emphasis added.)

App 1988); *People v. Wesley*, 140 Misc 2d 306, 533 NYS2d 643 (Co Ct 1988), *aff'd* 589 NYS2d 197 (App Div 1992).

In *State v. Herzog*, 125 Or App 10, 864 P2d 1362 (1993), *aff'd* 324 Or 294, 924 P2d 817 (1996) and *State v. Futch*, 123 Or App 176, 860 P2d 264 (1993), *aff'd* 324 Or 297, 924 P2d 832 (1996) the Court of Appeals held that, in general, forensic DNA evidence was admissible. The RFLP method was used in both cases. In *Herzog* and *Futch*, we agreed that the RFLP method of DNA analysis is scientifically valid for forensic purposes. National Research Council, *The Evaluation of Forensic DNA Evidence* (prepublication copy) 6-5 - 6-12 (1996) (hereinafter NRC (1996)); National Research Council, *DNA Technology in Forensic Science* 131-41 (1992) (hereinafter NRC (1992)).

We recognize that several appellate courts have concluded that forensic DNA evidence either was properly excluded or should not have been received at trial. *See, e.g., State v. Bible*, 175 Ariz 549, 858 P2d 1152 (1993), *cert den* 114 S Ct 1578 (rejecting DNA evidence because of the lack of general acceptance of the statistical probability of a random match; conviction affirmed on harmless error grounds); *People v. Barney*, 8 Cal App 4th 798, 10 Cal Rptr 2d 731, *rev den* (1992); *Commonwealth v. Curnin*, 409 Mass 218, 565 NE2d 440 (1991) (evidence excluded in the absence of a showing of the general acceptance of the validity of a particular DNA process); *People v. Castro*, 144 Misc 2d 956, 545 NYS2d 985 (Sup Ct 1989) (acknowledging that there is general scientific acceptance of the theory underlying DNA identification and that DNA forensic identification tests are reliable and meet the standard of admissibility; however, excluding DNA evidence because prosecution had failed to show that the analysts followed proper scientific procedures when they conducted the DNA tests in question); *State v. Schwartz*, 447 NW2d 422 (Minn 1989) (same as *Castro*). However, our reading of those cases persuades us that the bases of the appellate courts' decisions were factors *other than the reliability of the underlying theory of DNA or the technique applying that theory*.

[8] Several states have statutes mandating the admission of DNA evidence: Alabama, Connecticut, Delaware, Indiana, Louisiana, Maryland, Minnesota, Tennessee, Virginia, and Wisconsin. Oregon law presently regulates the use of genetic information in many respects. *See, e.g.,* ORS 109.250 *et seq* (Uniform Act on Blood Tests to Determine Paternity); ORS 137.076 (blood sample of certain convicted defendants required); ORS 161.325 (blood testing on judgment of guilty except for insanity); ORS 181.085 (authority of state police over blood samples and analysis); ORS 419C.473 (blood testing of juveniles); ORS 431.805 *et seq* (recombinant DNA research); ORS 659.227 (unlawful employment practice: genetic tests); ORS 659.036 (unlawful employment practice: genetic information); ORS 659.700 *et seq* (genetic privacy); ORS 746.135 (insurance: use of genetic tests).

Defendant asserts that there is a lack of available "specialized literature" about the PCR method and that PCR replication is so complicated that it would be very difficult, if not impossible, for a jury to understand and apply. He also foresees a potential "battle of the experts" that would not be helpful to the jury. Defendant also argues that the probative value of PCR-based DNA evidence is substantially outweighed by the danger of unfair prejudice and, therefore, it should be excluded under OEC 403. Last, defendant argues that (with perhaps one exception) the state's experts all come from the company (Cetus) that developed the PCR method and the particular test used in this case, suggesting that their testimony should be discounted because of their possible interest in promoting their present or former employer's interests.

Before assessing defendant's arguments, a brief overview of basic genetic principles and of the PCR replication method that was used in this case is warranted. The material that follows is taken from the quoted sources and also from the authorities cited below.[9]

### III. PRINCIPLES OF DNA

DNA is the "basic material of heredity" that determines the biological characteristics of the individual. JoAnn M. Longobardi, *DNA Fingerprinting and the Need for a National Data Base*, 17 Fordham Urb LJ 323, 325-26 (1989). "DNA is a long double-stranded molecule found in the chromosomes carried in nuclei of all cells." Jonathan J. Koehler, *DNA Matches and Statistics: Important Questions,*

---

[9] For a more detailed explanation of basic genetic principles and PCR replication, see NRC (1996) ch 2; NRC (1992); Norah Rudin and Keith Inman, *DNA Demystified: An Introduction to Forensic DNA Typing* (1994); Federal Judicial Center, *Reference Manual on Scientific Evidence* 273-329 (1994); Paul C. Giannelli and Edward J. Imwinkelreid, 2 *Scientific Evidence* ch 18 (2d ed 1993 and Supp 1996); Moenssens *et al.*, *Scientific Evidence in Civil and Criminal Cases* ch 15 (4th ed 1995); Kamrin T. MacKnight, *The Polymerase Chain Reaction (PCR): The Second Generation of DNA Analysis Methods Takes the Stand*, 9 Santa Clara Computer and High Technology LJ 287 (1993); William C. Thompson & Simon Ford, *DNA Typing: Acceptance and Weight of the New Genetic Identification Tests*, 75 Va L Rev 45 (1989) (although this article is critical of DNA testing, its authors acknowledge that the use of PCR testing in medical or other scientific research tends to show the scientific validity of the PCR method); Debra C. Moss, *DNA—The New Fingerprints*, 74 ABAJ 66 (May 1988); *see also* Thomas M. Fleming, Annotation, *Admissibility of DNA Identification Evidence*, 84 ALR 4th 313 (1991).

*Surprising Answers*, 76 Judicature 222, 223 (1993). Each of the 46 human chromosomes contains the DNA for thousands of individual genes, the units of heredity. Inside the nucleus, six feet of DNA are packaged into 23 pairs of chromosomes (one chromosome in each pair coming from each parent). Each cell in the human body (except red blood cells) contains the entire human genome—all the genetic information necessary to build a human being. For forensic purposes, DNA identification is based on the accepted fact that, except for identical twins, no two persons share the same genetic configurations, *i.e.*, each person's DNA is unique. *See United States v. Jacobetz*, 955 F2d 786, 791-800 (2d Cir 1992), *cert den* 506 US 834 (1992) (explaining DNA; affirming admissibility of DNA evidence under FRE "relevancy" standard); *United States v. Chischilly*, 30 F3d 1144, 1152-58 (9th Cir 1994), *cert den* 115 S Ct 946 (1995) (affirming admissibility of RFLP DNA evidence under *Daubert* and FRE 702).

> "Approximately 99.5% of the DNA code is the same for all people. That is what makes us human beings rather than turnips or porcupines. It is only the other 0.5% that is of interest to the forensic scientists. This portion may vary greatly between individuals and may manifest itself in individual traits such as eye, hair color and blood type. More often the differences in DNA sequence do not show themselves in physical appearance, but must be investigated using special laboratory techniques." Norah Rudin and Keith Inman, *DNA Demystified: An Introduction to Forensic DNA Typing* 21 (1994).

DNA may be envisioned as a long, twisted ladder, in which the rungs are pairs of organic bases (called *base-pairs*) that are bound together chemically. Each set of chromosomes contains approximately 3.3 million base pairs. The ladder is made up of four different organic bases—*a*denine, *c*ytosine, *g*uanine, and *t*hymine (A, C, G, and T)—that form pairs to create the rungs. A pairs with T, and C pairs with G. Thus, if one side of the ladder consists of the sequence ACCTCG, the opposite side is TGGAGC. The sequence of these base-pairs along the ladder carries the genetic code. A segment of this code that governs a particular characteristic of the organism is called a gene.

Through most of the genome, the sequence of base-pairs is nearly identical in every human. In some part of the genome, however, the DNA is *polymorphic*, which means that different sequences may be found in different people. Each distinctive sequence or configuration that may be found is called an *allele*. The number of alleles that exist in the human population differs at different *loci*, that is, at given locations in the genome. Some *loci* examined by forensic DNA tests have as few as two possible alleles; others have more than one hundred. Forensic DNA tests examine one or more polymorphic *loci* and determine which alleles (of those that exist in the human population) are present in a given sample.

The types of cells that are of most interest for DNA analysis include white blood cells, sperm cells, hair root cells, and cells in saliva. NCR (1992) at 2. To "type" a sample of blood, semen, or other tissue, DNA first must be extracted from it. There are several extraction methods, which vary in their efficiency, ease of use, and appropriateness for different types of samples and different test procedures. Those methods have not been controversial. The biological and technological principles underlying the methods of characterizing DNA variations have generated little controversy in court.[10] With the exception of the use of DNA to link a suspect to a crime, none of the other common uses of DNA typing has been seriously contested by the legal or scientific communities.[11] *See* NRC (1996) at 0-28 and ch 6 (DNA evidence in the legal system).

---

[10] In 1992, the National Research Council Committee on DNA Technology in Forensic Science reported that "[b]y 1991, DNA evidence had been considered in hundreds of *Frye* hearings involving felony prosecutions in more than 40 states. The overwhelming majority of trial courts ruled that such evidence was admissible, [with] some important exceptions." NRC (1992) at 21-22.

[11] Immigration and paternity disputes were some of the first legal arenas in which DNA typing was used. DNA has been used to identify missing persons, to identify the remains of persons killed in combat, and has become an important tool in the study of anthropology and ancient history.

In *Plemel v. Walter*, 303 Or 262, 278-79, 735 P2d 1209 (1987), a paternity case, this court held that blood tests analyzed for certain genetic markers were admissible insofar as they measured the chance that the defendant was the father, compared to the chance that a randomly selected man was the father. *Plemel* made it clear that the expert in that case could not testify concerning the *probability* that the defendant was the father. The court concluded that, if the expert was limited to the above-stated analysis, the evidence was admissible. The trial court here found that the expert's conclusion offered in this case would be less confusing to the jury than that admitted in *Plemel*.

If the analyst determines that a suspect's DNA "matches" the evidence DNA, the analyst must determine the statistical significance of that match by calculating the probability that another person chosen at random, other than the suspect, would share this same genetic profile.[12] If the suspect's DNA and the evidence DNA share a profile that has a low frequency in the population, that suggests that the samples came from the same person; the lower the frequency, the stronger the evidence. Rudin and Inman, *DNA Demystified* at 77-81 (explaining the meaning of a match); *see also* NRC (1996) at 6-23 (same). Much of the controversy about the forensic use of DNA has involved population genetics. To assess the probability that DNA from a randomly selected person has the same profile as the evidence DNA, the analyst must know the frequency of that profile in the population. That frequency is usually determined by comparison with some reference data set. NRC (1996) at 4-1.

The first forensic use of DNA in a criminal case took place in England in 1985, where DNA evidence helped convict a murderer. A man, who first was suspected of the murder, was exonerated by the DNA evidence. DNA typing was first used in the United States by commercial laboratories in 1986 and by the Federal Bureau of Investigation (FBI) in 1988. NRC (1992) at 1. DNA evidence made its appellate debut in *Andrews v. State*, 533 So 2d 841 (Fla App 1988), *rev den* 542 So 2d 1332 (Fla 1989), where the court held that DNA test results were admissible. In the years following *Andrews*, courts in more than 40 states considered the admissibility of DNA evidence in hundreds of cases. NRC (1992) at 21-22.

Before 1992, there was controversy over two main issues pertaining to DNA testing: laboratory error and population substructure. The NRC 1992 report was intended to resolve the controversy, but the debate continued.[13] Much of

---

[12] Defendant did not specifically challenge the technique involved in calculating the statistical significance of the "match" between his DNA and the "evidence DNA" that was recovered at the crime scene.

[13] Some proponents of DNA evidence immediately attacked the NRC (1992) report as unsound. *See, e.g.,* B. Devlin, Neil Risch & Kathryn Roeder, *Statistical Evaluation of DNA Fingerprinting: A Critique of the NRC's Report,* 259 Science 748 (Feb 5, 1993); Peter Aldhous, *Geneticists Attack NC Report As Scientifically Flawed,* 259 Science 755 (Feb 5, 1993).

defendant's criticism of the PCR method relies on the NRC critique of the technique published in 1992.[14] The NRC (1996) report, which deals mainly with the computation of the probabilities used to evaluate the implications of DNA test results that incriminate suspects, focuses on situations where the DNA profile of a suspect apparently matches that of the evidence DNA. The central question that the NRC (1996) report addresses is: What information can a forensic scientist, population geneticist, or statistician provide to assist a judge or jury in drawing inferences from the finding of a match? The NRC 1996 report states:

. "The technology for DNA profiling and the methods for estimating frequencies and related statistics have progressed to the point where the reliability and validity of properly collected and analyzed DNA data should not be in doubt." NRC (1996) at ES-1.

## IV. PCR REPLICATION

After extraction, laboratories typically estimate the quantity of DNA in each sample. The amount of DNA required for testing varies for different procedures. *Restriction Fragment Length Polymorphism* (RFLP) analysis, which has the greatest specificity, requires more and better quality DNA, typically 50 to 100 nanograms (NG).[15] However, because forensic evidence sometimes is old, degraded, or of limited quantity, the newer PCR replication method is employed in such cases, because that method requires considerably less biological material than RFLP. Thus, PCR replication and RFLP analysis tend to be used in different types of cases.

The PCR method, first reported in 1985, can test much smaller samples than the RFLP procedure. However, its ability to identify a particular individual to the exclusion of others is much lower. Although the initial step of extracting the DNA from a sample is similar to the first step of the

---

[14] William C. Thompson, *Evaluating the Admissibility of New Genetic Identification Tests: Lessons from the "DNA War,"* 84 J Crim L & Criminology 22 (1993) (discussing the disagreements among experts and proposing how courts should respond).

[15] A nanogram (NG) is one-billionth of a gram.

RFLP test, the other steps in the PCR procedure involve different laboratory procedures.

> "The amount of testable DNA may be increased by a technique known as the polymerase chain reaction, or PCR amplification. PCR mimics DNA's self-replicating properties to make up to millions of copies of the original DNA sample in only a few hours. Although the term PCR often is used loosely to refer to the entire process of replicating DNA and testing for the presence of matching alleles, the term properly refers only to the *replication* portion of that process. After amplifying a DNA sample with PCR, technicians must use other methods to determine whether a known and unknown sample match." Federal Judicial Center, *Reference Manual on Scientific Evidence* 287-88 (1994) (emphasis in original; footnote omitted).

*See also* Moenssens, *et al.*, *Scientific Evidence in Civil and Criminal Cases*, 910-17 (4th ed 1995) (explaining PCR method). The PCR method itself is not a genetic test; it is a mere amplification technique. After amplification, the analyst can employ a variety of procedures to identify the amplified material. Unlike RFLP-DNA analysis, PCR-based DNA analysis does not purport to identify an individual as a certain match; however, it excludes a percentage of the population.[16] The PCR method achieved widespread acceptance by scientists within a few years of its discovery, and by 1988, it was in common use in genetic research laboratories.[17] The

---

[16] Applying statistics to PCR test results presents a fundamentally different issue from the controversy involving RFLP testing that was discussed in NRC (1992). Each method includes a substantially different basis for determining population frequencies. The RFLP method is considerably more discriminating than PCR, with the result being that statistics are considerably more significant under the RFLP method. Also, there is a significant difference as to the data base. The frequency data under PCR is but an estimate. Rudin and Inman, *DNA Desmystified* at 47, 77-81; *see also*, MacKnight, 9 Santa Clara Computer and High Tech LJ at 294-308 (discussing RFLP and PCR methods).

[17] *See* NRC (1992) at 63; NRC (1996) at 6-10; MacKnight, 9 Santa Clara Computer & High Tech LJ 287 (responding to attacks on PCR). The NRC has evaluated the post-1992 research on PCR and endorses the use of PCR testing. NRC (1996). *See also*, Catherine T. Comey and Bruce Budowle, *Validation Studies on the Analysis of the HLA DQA Locus Using the Polymerase Chain Reaction*, 36 J Forensic Sciences 1633 (1991) (experiments indicate that typing of the DQA gene by PCR and detection of specific alleles can be accomplished, when the typing is done using proper protocols, without producing false positive or false negative results); Catherine T. Comey, *et al.*, *PCR Amplification and Typing of the HLA DQA Gene in Forensic Samples*, 38 J Forensic Sciences 239 (1993) (study provides additional

first use of PCR-based DNA evidence in a criminal case in the United States is believed to be *Commonwealth v. Pestinikis*, a 1986 Pennsylvannia case. The Virginia Supreme Court was the first state supreme court to consider PCR-based DNA test evidence. In *Spencer v. Commonwealth*, 240 Va 78, 393 SE2d 609, 620-21, *cert den* 498 US 908 (1990), the court held PCR-based DNA typing of the forensic sample to be sufficiently reliable to warrant admission. More than a dozen appellate courts have affirmed the admissibility of PCR-based DNA test evidence.[18] Defendant cites no case in which an appellate court has rejected PCR technology for lack of general acceptance, and our independent research discloses none. We conclude that PCR testing has been evaluated extensively by the scientific community.[19] It has been found to be a valid method for typing portions of a gene strand, which test can be reliably applied to numerous scientific disciplines, including forensics.

## V. STANDARD FOR ADMISSIBILITY OF SCIENTIFIC EVIDENCE

In *Brown*, this court abandoned special tests for the admissibility of scientific evidence in favor of resolving the problem by relying on traditional evidence law as codified in the Oregon Evidence Code (OEC), specifically OEC 401 (relevance), OEC 702 (opinions of experts), and OEC 403 (exclusion of relevant evidence on ground of prejudice, confusion or undue delay). *Brown*, 297 Or at 408.

---

support that the HLA DQA typing procedure is a valid procedure for typing forensic samples).

[18] *See, e.g.*, *People v. Morganti*, 43 Cal App 4th 643, 50 Cal Rptr 2d 837, *rev den* (1996); *State v. Gentry*, 125 Wash 2d 570, 888 P2d 1105 (1995), *cert den* 116 S Ct 131 (under *Frye* test); *People v. McMillan*, 213 Mich App 134, 539 NW2d 553 (1995); *State v. Russell*, 125 Wash 2d 24, 882 P2d 747 (1994), *cert den* 115 S Ct 2004 (1995) (under *Frye* test); *State v. Moore*, 268 Mont 20, 885 P2d 457 (1994); *People v. Palumbo*, 162 Misc 2d 650, 618 NYS2d 197 (Sup Ct 1994); *Clarke v. State*, 839 SW2d 92, (Tex Cr App 1992), *cert den* 113 S Ct 1611 (1993); *State v. Williams*, 252 NJ Super 369, 599 A2d 960 (1991) (under *Frye* test); *Seritt v. State*, 647 So2d 1 (Ala App 1994) (under *Frye* test).

[19] *See Daubert*, 509 US at 593 (whether a scientific theory or technique will assist the trier of fact depends on whether it can be tested and whether it has been subject to peer review). In *Brown*, 297 Or at 427, this court stated that "[w]idespread use [of a scientific technique] may have some bearing on probity, but is certainly not determinative."

"Under the Oregon Evidence Code and traditional evidence law, expert testimony is admissible if it is relevant under OEC 401 and will help the trier of fact in deciding a disputed issue. To be helpful, the subject of the testimony must be within the expert's field, the witness must be qualified, and the foundation for the opinion must intelligibly relate the testimony to the fact. *If these conditions are satisfied, the testimony will be excluded only if* it is unduly prejudicial, repetitive, or falls under some other exclusionary provision as provided in OEC 403:

> " 'Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay or needless presentation of cumulative evidence.'

"In applying OEC 401, 702 and 403, the court must identify and evaluate the probative value of the evidence, consider how it might impair rather than help the factfinder, and decide whether truthfinding is better served by exclusion or admission." *Id.* at 409 (emphasis added).

Pursuant to OEC 104(1), the trial judge must decide whether the proffered evidence satisfies the minimum threshold of logical relevance required by OEC 401. *State v. Hampton*, 317 Or 251, 255-56, 855 P2d 621 (1993); *State v. Carlson*, 311 Or 201, 208-10, 808 P2d 1002 (1991). OEC 401 requires a very low threshold of relevance. *Dyer v. R.E. Christiansen Trucking, Inc.*, 318 Or 391, 395 n 4, 868 P2d 1325 (1994). Evidence that increases, even slightly, the probability of the existence of a material fact is relevant evidence. *State v. Williams*, 313 Or 19, 29, 828 P2d 1006 (1992).

In *Brown*, this court identified a number of factors that a trial court must consider in ruling under OEC 401 and OEC 702:

"(1) The technique's general acceptance in the field;

"(2) The expert's qualifications and stature;

"(3) The use which has been made of the technique;

"(4) The potential rate of error;

"(5) The existence of specialized literature;

"(6) The novelty of the invention; and

"(7) The extent to which the technique relies on the subjective interpretation of the expert." *Id.* at 417.[20]

The *Brown* factors were not intended to be exclusive, nor were they intended to be taken as a mechanical checklist of foundational requirements. What is important is not lock-step affirmative findings as to each factor, but analysis of each factor by the court in reaching its decision on the probative value of the evidence under OEC 401 and OEC 702. *Brown*, 297 Or at 417-18. We proceed to review the trial court's ruling in the light of the *Brown* standard. In doing so, we accept as established the proposition that DNA typing and PCR replication themselves are based on a large body of scientific principles and techniques that are universally accepted. *See* NRC (1996) at 0-1 (so stating).

### (1) The technique's general acceptance in the field:

Defendant argues that the PCR method is not generally accepted for *forensic* purposes. He concedes that the PCR method generally is accepted among *scientists* and that the PCR method is accepted as reliable for medical diagnosis and biological DNA research in the general scientific community. Both parties' experts testified that scientists conducting DNA research agree that the PCR method accurately

---

[20] In a footnote, *Brown* listed somewhat overlapping additional factors to be considered:

"(1) The potential error rate in using the technique;

"(2) The existence and maintenance of standards governing its use;

"(3) Presence of safeguards in the characteristics of the technique;

"(4) Analogy to other scientific techniques whose results are admissible;

"(5) The extent to which the technique has been accepted by scientists in the field involved;

"(6) The nature and breadth of the inference adduced;

"(7) The clarity and simplicity with which the technique can be described and its results explained;

"(8) The extent to which the basic data are verifiable by the court and jury;

"(9) The availability of other experts to test and evaluate the technique;

"(10) The probative significance of the evidence in the circumstances of the case; and

"(11) The care with which the technique was employed in the case." *Brown*, 297 Or at 417-18 n 5.

and reliably replicates small samples of DNA. Gerdes, defendant's expert witness, testified that he had no problem with the validity of the PCR-based DNA tests. However, due to the possibility of contamination, he expressed doubts as to the *forensic* use of the tests.[21]

The trial court found:

"The evidence is clear that the PCR process is widely used in scientific and medical practice. Both sides agree that the PCR procedure for amplifying limited samples of genetic material has been applied in both medical research and diagnosis, ranging from tissue transplants to the detection of viruses. It also has widespread application in other fields of genetic research and molecular biology. * * *

"PCR is widely accepted as a scientific procedure by which limited DNA samples can be accurately and reliably replicated. * * *

"[T]he procedure described in this case has had frequent review by other courts and is on the verge of being adopted by various laboratories in the public sector, including the Federal Bureau of Investigation."

As noted, the PCR method achieved widespread acceptance by scientists within a few years of its discovery. By 1990, it was one of the most widely used techniques in medical diagnosis and biological research. We reject defendant's premise that the "forensic" field is not part of the larger "scientific" community. We conclude, as did the trial court, that the PCR method generally is accepted as being scientifically valid by the scientific community, *including the forensic field.*[22]

---

[21] When this case was in the trial court, there was some disagreement among experts about whether the PCR method was appropriate for *forensic* use. The disagreement centered primarily on the fact that samples obtained at crime scenes sometimes are recovered under adverse conditions that can result in various forms of contamination before the sample reaches a laboratory. *See* NRC (1992); *but see* MacKnight, 9 Santa Clara Computer & High Tech LJ at 315-18 (FBI validation study debunks this criticism, and proper laboratory layout can minimize the risk).

[22] In 1992, the National Research Council noted that "[t]he theory of PCR analysis * * * is scientifically accepted and has been accepted by a number of courts." NRC (1992) at 70. In 1996, the National Research Council reported that "[t]he technology for DNA profiling and the methods for estimating frequencies and related statistics have progressed to the point where the reliability and validity of

*(2) The expert's qualifications and stature:*

Defendant concedes, and the trial court found, that the state's expert witness, Blake, was qualified to testify concerning the PCR method. Defendant submitted contradicting expert testimony attacking the results of Blake's PCR-based DNA testing. That attack goes to the weight of the evidence, not to its admissibility.

*(3) The use that has been made of the PCR method*:

Defendant argues that the PCR method has had limited use in the *forensic* field.

The trial court found:

> "[T]he PCR procedure has widespread use in the medical field, where it is relied upon for both research and diagnosis. Here again, the Defendant urges a finding that the procedure has had limited use in forensic application. However, Dr. Blake has testified that he has utilized the procedure in over 200 criminal cases and has done testing for the prosecution and the defense in approximately equal numbers. Additionally, the results of such tests have been admitted in court in 14 of 17 cases in which Dr. Blake has been involved, though most courts employ a different analysis than that set forth in [*Brown*]."

At the time that the trial court considered the admissibility of the PCR-based DNA evidence in this case, the PCR method had been used forensically in eight states, and PCR-based DNA evidence had been admitted into evidence in several of those states. Moreover, the FBI, at least two state crime laboratories, and several private forensic laboratories were using PCR-based DNA testing. Moreover, even if there had been an absence of widespread *forensic* use of the PCR method before the time this case went to trial, that fact alone would not be determinative of the admissibility of PCR-based DNA evidence in this case. *Brown*, 297 Or at 427. We conclude that the PCR method had general acceptance in the forensic field.[23]

---

properly collected and analyzed DNA data should not be in doubt." NRC (1996) at ES-1.

[23] *See* Rockne P. Harmon, *Legal Criticisms of DNA Typing: Where's the Beef?*, 84 J of Crim L & Criminology 175 (1993) (arguing that in most cases DNA evidence merely provides corroborative evidence of guilt).

### (4) The potential rate of error:

Defendant argues that the PCR method has an unacceptable potential rate of error, because the user protocols for the PCR method do not eliminate the possibility of human error and cannot prevent certain types of errors.

The trial court found:

> "The Court is satisfied that the reliability of PCR technology combined with the utilization of specific protocols and the employment of controls, ensures a result that is virtually error-free.[24] Should questions remain, Dr. Blake has testified that half of the DNA sample and half of the PCR product have been retained for retesting."

In this case, both processed and unprocessed forensic samples were preserved for defense testing and retesting, yet defendant took no action in that regard. The record does not disclose why defendant did not conduct his own independent testing or retesting. Defendant will not be heard on appeal to complain that the PCR-based DNA testing in this case is suspect when he failed to seek to conduct the independent testing or retesting that he now argues the state should have conducted.

The state concedes that forensic DNA samples, as compared to samples obtained for medical research or for other nonforensic purposes, more often are contaminated or degraded. However, concerns about contamination and degradation of forensic samples are not unique to DNA samples. Those concerns may arise with respect to any forensic evidence. The potential for contamination may present an open field for cross-examination or may be addressed through the testimony of defense experts at trial, as is true with other forensic evidence. However, it does not mean that the PCR method itself is inappropriate for forensic use. The possibility of human error does not prevent scientists from relying on scientific analysis if safeguards against such errors exist and

---

[24] *See* MacKnight, 9 Santa Clara Computer & High Tech LJ at 314-15 (controlling the temperature of the test eliminates risk of allelic dropout). *See also* Nicola Fields & Rebecca Reynolds, *Consistency and Reproducibility of AmpliType PM Results Between Seven Laboratories: Field Trial Results*, 40 J Forensic Sciences 279 (1995) ("No samples were typed incorrectly.").

are followed. Courts do not require that scientific tests be infallible to be admissible. Only reasonable certainty must follow from the tests. *See, e.g., Hampton,* 317 Or at 255 ("The possibility that an inconsistent or contradictory inference may reasonably be drawn from the offered item of evidence does not destroy that item's relevancy so long as the inference desired by the proponent is also a reasonable one.").

Blake testified that he followed the protocols for the PCR method and conducted control tests to ensure the validity of his work.[25] We conclude that there is no persuasive evidence in the record that the PCR-based DNA evidence in this case was subject to a rate of error that would preclude admissibility.

### *(5) The existence of specialized literature:*

Defendant argues that, because scientists with financial or professional interests in the success of the PCR method produced much of the specialized literature about the method, there is insufficient independent and unbiased specialized literature in the field. The trial court found:

> "The evidence is that thousands of articles concerning PCR technology in general, and numerous articles concerning the specific forensic application as done in this case, have been published. It is noteworthy that many of the forensic PCR articles have been published in peer review journals, and are thus submitted to close scientific scrutiny. In addition, the AmpliType User Guide, and indeed the kit itself, are published and therefore subject to review by the scientific community."

Defendant's argument is an attack on the credibility of the literature, not on its existence. There is no dispute that abundant scientific literature concerning the PCR method

---

[25] Blake testified about numerous practices used in his laboratory to ensure that samples will not become contaminated and described various controls and procedures in the amplification and typing process designed to prevent or detect errors. Indeed, the evidence was that, in most cases in which problems develop, the result is simply that no result is obtained. *See* Howard C. Coleman, *DNA Analysis: Casework Problem Identification,* 13 The Oregon Defense Attorney 8, 9 (June/July 1992) ("To date there are no known cases of innocent individuals being falsely accused as a result of DNA evidence. The likelihood of this occurring is small because the complicated nature of the DNA technology results in a bias toward an inconclusive or false negative as opposed to a false positive.").

exists and that peer-review journals have published many of those articles. There is evidence in the record that, between 1985 and the time of trial in this case, over 4,000 published scientific articles existed examining PCR technology.[26] That literature describes use of the PCR method in medical, animal, and plant research, as well as by the FBI and the military services. Across a broad scientific spectrum, the validity of the PCR method has been demonstrated. Defendant has not cited any peer review articles that have discredited the underlying theory of the PCR method. In fact, defendant's expert testified that he used PCR in his research. His only concern was the possibility of *contamination* when PCR was used in a *forensic* context. We conclude that sufficient specialized literature exists to satisfy this *Brown* factor.

### (6) The novelty of the invention:

Defendant argues that the PCR method is too "novel" to be considered reliable. Defendant does not present any persuasive argument as to why the novelty of the technique alone should make evidence produced by the method inadmissible.[27]

The trial court found:

"The *Brown* court adopted the Webster definition of 'novelty' as something 'new or unusual.' There is no question that the application of PCR technology to forensic examination is a recent development. The AmpliType kit utilized in this case has been used for about a year. PCR

---

[26] Professor Imwinkelreid reported in 1991 that "[a] massive body of scientific literature on DNA evidence now exists, and the number of law review articles analyzing DNA typing is increasing exponentially." Edward J. Imwinkelreid, *The Debate in the DNA Cases Over the Foundation for the Admission of Scientific Evidence: The Importance of Human Error as a Cause of Forensic Misanalysis,* 69 Wash U LQ 19-20 (1991).

[27] Numerous scholarly articles discussing the admissibility of DNA test evidence were available at about the time this case was pending in the trial court. *See, e.g.,* Thompson & Ford, 75 Va L Rev 45; Comment, *The Admissibility of Scientific Evidence in Illinois,* 21 Loy U Chi LJ 935 (1990); Comment, *Admissibility of DNA Genetic Profiling Evidence in Criminal Proceedings: The Case of Caution,* 18 Pepp L Rev 123 (1990); Comment, *Criminal Procedure—Match-Game 1990's: The Admissibility of DNA Profiling—State v. Pennington,* 13 Campbell L Rev 209; Imwinkelreid, 69 Wash U LQ 19 (1991); Paul C. Giannelli, *Criminal Discovery, Scientific Evidence, and DNA,* 44 Vand L Rev 791 (1991); Christopher G. Shank, *DNA Evidence in Criminal Trials: Modifying the Law's Approach to Protect the Accused From Prejudicial Genetic Evidence,* 34 Ariz L Rev 819 (1992).

technology in general has been in use for several years, and the idea of genetic typing by DNA analysis (so-called 'genetic fingerprinting') is older still. This Court has considered the novelty of this technology but has weighed that factor against the rather extensive use which has been made of this technology."

The PCR method may be novel, in the sense that it is new; however, it does not present the problem that the *Brown* court identified in usurping the trier of fact's role of assessing the credibility of witnesses. We conclude, as did the trial court, that the novelty of the PCR method is not a negative factor in our analysis.

*(7) The extent to which the technique relies on the subjective interpretation of the expert:*

Defendant concedes, and the trial court found, that the PCR method does not rely on the subjective interpretation of the expert.

*(8) Other Brown factors:*

As noted, *Brown* suggested other factors that the court might consider in determining the admissibility of novel scientific evidence. *Brown*, 297 Or at 417-18 n 5.

The trial court found:

"1. Though the evidence presented by the State for the Court's analysis in determining the admissibility of this evidence was lengthy and often complex, the Court is convinced that this technology can be fairly simply and briefly described to the jury, and that the results are certainly less confusing than those admitted in *Plemel v. Walter*.

"2. Dr. Blake has retained sufficient amounts of both the DNA samples and PCR product for retesting, and has suggested a number of scientific resources who could be available to do so.

"3. Dr. Blake's report, and testimonial description of the testing process, and test strips, are available for analysis and criticism by other experts.

"4. The probative value of this evidence should be analyzed in light of other evidence that the parties stipulated would be offered by the State. That evidence included

analysis of bite marks on the victim's body which a forensic dentist can attribute to the Defendant, analysis of saliva found in one of the bite marks which has been ABO-typed as 'A, secretor,' a group which includes the Defendant, the fact that the hairs tested by Dr. Blake are microscopically consistent with hairs taken from the Defendant, the fact that the Defendant's wallet was found in the room with the victim, and the Defendant's admission that he had been in the room with the victim prior to the murder. Dr. Blake's PCR analysis of the hair samples could have excluded the Defendant as the donor, but did not."[28]

We agree with the trial court on those points.[29]

■ Defendant argues, however, that PCR-based DNA evidence should be excluded under OEC 702, because the use of this type of evidence sets up a "battle of the experts" that would not be helpful to the jury. However, controversy within the scientific community is not necessarily a ground for exclusion of scientific evidence. In deciding whether to admit scientific evidence, a court need not resolve disputes between reputable experts; the evidence may be admissible even though a dispute exists. *See Bales v. SAIF*, 294 Or 224, 234-35, 656 P2d 300 (1982) (decision as to which of two schools of medical thought is correct is a question of fact to be decided by presenting, in proper evidentiary form, the various views to the factfinder). This court stated in *Bales* that the witness who testifies to an expert opinion is subject to cross-examination concerning how he or she arrived at that opinion, and the cross-examiner is to be given "great latitude" in eliciting

---

[28] DNA testing may eliminate a suspect from consideration by the prosecution. *See Research Report, Convicted by Juries, Exonerated by Science: Case Studies in the Use of DNA Evidence to Establish Innocence After Trial,* National Institute of Justice, U.S. Dept. of Justice (June 1996). According to the FBI, about one-third of those named as a primary suspect in rape cases are excluded by DNA evidence. NCR (1996) at 0-3. *See* Peter J. Neufeld, *Have You No Sense of Decency?,* 84 J Crim L & Criminology 189 (1993) (criticizing prosecutorial misuse of DNA evidence and urging defense use of DNA evidence to establish innocence of suspect); *Developments In The Law: Confronting The New Challenges Of Scientific Evidence,* 108 Harv L Rev 1481, 1557-82 (1995) (discussing DNA evidence in the criminal defense). Although DNA evidence may later demonstrate the innocence of a convicted person, our research in this case has failed to disclose any in which it has been shown that a DNA testing laboratory's incorrect match of two samples resulted in the conviction of an innocent person.

[29] The trial court's eight-page "Order Regarding Admissibility of Scientific Evidence" is a model of clarity and analysis under the *Brown* standard.

testimony to vitiate the opinion. *Id.* at 235 n 4. *See Wulff v. Sprouse-Reitz Co., Inc.*, 262 Or 293, 309, 498 P2d 766 (1972) (same).

Although the PCR method indeed is complex, the result is expressed in easily understood terms and does not purport to identify positively the donor of the sample found at the scene. Moreover, in this case, the presentation of the evidence at trial was not so complex or confusing as to distract jurors from the central issues in the case. Only two experts, one for the state and one for the defendant, testified at trial about the PCR-based DNA evidence. Their combined testimony comprises less than 200 pages of transcript. The experts' testimony about PCR-based DNA evidence meets the helpfulness requirement of OEC 702.

After evaluating the numerous *Brown* factors in connection with OEC 401 and OEC 702, we conclude that, when offered as proof of identification, PCR-based DNA evidence is relevant under OEC 401, because it would tend to make more probable the identification of the defendant than without such evidence. Moreover, both the underlying theory supporting DNA testing and the PCR method are scientifically valid for forensic purposes. Blake's testimony was admissible under OEC 702, because it would be helpful to the jury in understanding the state's PCR-based DNA evidence. We proceed to consider whether the state's PCR-based DNA evidence should have been excluded under OEC 403.[30]

■ OEC 403 articulates the judicial power to exclude relevant evidence if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay or needless presentation of cumulative evidence. *Brown*, 297 Or at 438-39; *State v. Johanesen*, 319 Or 128,

---

[30] This court excluded polygraph evidence in *Brown* under OEC 403, because "the probative value of polygraph evidence is far outweighed by reasons for its exclusion," and because OEC 608(2) prohibits the admission of evidence of specific instances of conduct of a witness for the purpose of attacking or supporting the credibility of the witness. *Brown*, 297 Or at 442-43.

Although a trial court's OEC 403 ruling normally is reviewed for abuse of discretion, *State v. Williams*, 313 Or 19, 29-30, 828 P2d 1006 (1992), where scientific evidence is at issue, appellate review is *de novo*. *O'Key*, 321 Or at 320; *Brown*, 297 Or at 442.

136, 873 P2d 1065 (1994). OEC 403 requires that the probative value of the evidence be compared to the articulated reasons for exclusion and permits exclusion only if one or more of those reasons "substantially outweighs" the probative value. *Id.* The existence of one or more of the articulated reasons for exclusion set forth in OEC 403 is a preliminary question of fact under OEC 104(1). *Johanesen*, 319 Or at 136 n 10; *State ex rel Juv. Dept. v. Beasley*, 314 Or 444, 453 n 17, 840 P2d 78 (1992).

 In the context of OEC 403, "unfair prejudice" does not mean that the "evidence is harmful to the opponent's case—a central reason for offering evidence." *Hampton*, 317 Or at 259 n 15. Rather, it means an undue tendency to suggest a decision on an improper basis, commonly, although not always, an emotional one. *State v. Pinnell*, 311 Or 98, 105-06 n 12, 806 P2d 110 (1991). All evidence presented by one party is intended to prejudice the opposing party, *i.e.*, to increase the likelihood that the opposing party will lose the case. The relevant inquiry is whether the evidence was *unfairly* prejudicial. *Williams*, 313 Or at 29. "Unfair prejudice" describes a situation in which the preferences of the trier of fact are affected by reasons essentially unrelated to the persuasive power of the evidence to establish a fact of consequence.

We conclude, as did the trial court, that the probative value of the state's PCR-based DNA evidence was not substantially outweighed by any of the reasons listed in OEC 403 for exclusion. Nothing in defendant's argument persuades us that the trial court's ruling in that regard was erroneous.

 In summary, we hold that the trial court correctly applied the principles laid down by this court in *Brown* and, thus, did not err in admitting the state's PCR-based DNA evidence.[31]

---

[31] Once a trial court has decided that a type of proffered scientific evidence is scientifically valid and has admitted such evidence for the particular purpose to which it is directed, and that decision is affirmed by this court in a published opinion, it will become controlling precedent in later trials. *O'Key*, 321 Or at 293. In this case, we hold that PCR-based DNA evidence satisfies the *Brown* standard of admissibility. Accordingly, it is no longer necessary for trial courts to conduct *Brown* inquiries to determine whether such evidence is admissible for forensic purposes. As each *new technique* is developed, however, trial courts will be required to

## VI. DISCLOSURE OF MENTAL HEALTH RECORDS

Defendant next contends that the trial court erred in failing to disclose to the defense nonexculpatory material contained in the mental health records of a person who defendant claims committed the crimes. Defendant argues that the Court of Appeals' construction of his right to compulsory process is "overly narrow." He asserts that he should be allowed to receive not only exculpatory material, but also any other material that "might lead to the discovery of exculpatory material."

At trial, the court allowed Heiss, a taxi driver, to testify that, on an evening shortly after the homicide, he drove a man named Crook to the Stage Stop Inn. When the taxi arrived, Crook got out, approached a policeman and stated that he had killed a woman at the Stage Stop Inn. The state was permitted to rebut defendant's claim that Crook was responsible for the crimes by showing that Crook's teeth, saliva, hair, and blood did not match the physical evidence at the scene. Police officers, who also were present with Crook and the taxi driver, denied that Crook had confessed to them.

Defendant subpoenaed Crook's mental health records from Dammasch State Hospital and from the Lane County Mental Health Department (LCMHD) for use at trial. He asked that he be given all "relevant and exculpatory" material in the files. Counsel for Crook and for the LCMHD moved to quash the subpoena on the grounds that the records were confidential, as well as protected by the psychotherapist-patient privilege. *See* OEC 504 (providing privilege). After conducting an *in camera* review of the records, *see generally State ex rel Dugan v. Tiktin*, 313 Or 607, 609, 837 P2d 959 (1992) (explaining trial court's role to examine privileged materials *in camera*), the trial court found that nothing in the files subpoenaed by defendant was exculpatory and refused to permit their disclosure.

On appeal, defendant abandoned his claim that the records contained exculpatory material. He now argues that,

---

determine whether that new technique is scientifically valid and, if so, whether the particular evidence should be admitted or excluded under OEC 401, OEC 702, or OEC 403 in the light of the specific facts of the particular case.

under federal due process principles, he was entitled to receive all unprivileged material in the records, whether exculpatory or not. The state responds that a number of confidentiality statutes prohibit the disclosure of much of Crook's records. We need not analyze the application of those statutes, however, to resolve this issue. In the trial court, defendant argued only that federal due process principles entitled him to all "relevant and exculpatory" material, privileged or not, in Crook's medical records. On appeal, he changed grounds and argued that he was entitled to receive all unprivileged material, whether exculpatory or not. That argument was not raised below, and we decline to address it.[32]

The decision of the Court of Appeals is affirmed. The judgment of the circuit court is remanded for entry of amended judgment merging murder counts for purposes of conviction and sentence; otherwise affirmed.

---

[32] Defendant also contended in the Court of Appeals that the trial court erred in entering separate convictions for aggravated murder, murder, and burglary. The state agreed that, as a matter of law, the aggravated murder and murder convictions merged. However, the judgment provided only that those counts merged for the purposes of sentencing. The Court of Appeals, therefore, remanded for entry of an amended judgment merging the murder counts for purposes of *conviction and sentencing. Lyons,* 124 Or App at 611-12. The court held that merger of the burglary conviction was not required. *Id.* at 612-14. Defendant does not challenge that holding on review, and we do not address it.