68 P.3d 127

**STATE of Arizona, Appellee,**

v.

**Schuylar Ray DAVIS, Appellant.**

**No. 1 CA–CR 02–0007.**

Court of Appeals of Arizona,
Division 1, Department D.

Dec. 17, 2002.

As Amended April 23, 2003.

Redesignated as Opinion by
Order April 24, 2003.

Janet Napolitano, Attorney General By Randall M. Howe, Chief Counsel, Criminal Appeals Section and Robert L. Walsh, Assistant Attorney General, Phoenix, for Appellee.

James J. Haas, Maricopa County Public Defender By James R. Rummage, Deputy Public Defender, Phoenix, for Appellant.

## OPINION

THOMPSON, Judge.

¶ 1 Schuylar Ray Davis (defendant) appeals from his conviction and sentence for second degree murder. For the reasons set forth below, we affirm.

## FACTUAL AND PROCEDURAL HISTORY

¶ 2 We view the facts in the light most favorable to sustaining the jury's verdict and resolve all inferences against defendant. *State v. Fontes,* 195 Ariz. 229, 230, ¶ 2, 986 P.2d 897, 898 (App.1998).

¶ 3 On October 1, 2000, at approximately 8:30 p.m., J.M.'s seventeen year-old daughter, Jackie, arrived at her home in Avondale and told her mother that defendant was coming into the house to "visit with her for a while." J.M. looked outside and saw a blue pickup truck with someone in the driver's seat. Jackie told her mother that she was going out to get defendant, but returned inside without him. Instead, she informed her mother that she was going out to the desert with defendant "to talk" and left around 9:00 p.m. J.M. never saw her daughter alive again and made a missing person's report to Avondale Police on October 3rd.

¶ 4 At some point during either the late night of October 1st or the early morning of October 2nd, 2000, defendant appeared at the home of C.O., where his girlfriend M.L. was staying, and asked to take a shower. C.O. noticed that defendant had blood on his pants and later found a footprint with blood on her bathroom floor. M.L. also noticed blood on defendant's pants. When C.O. asked him what had happened, defendant told her that he had gotten into a fight with someone who had jumped him at a Circle K and tried to steal his truck.

¶ 5 Defendant took a shower and asked C.O. for a pair of her son's shorts to wear, which she gave him. He also asked her if he could burn a stick and some clothes in her

backyard, but she said he could not. He then left the house, but returned at some undetermined time because M.L. discovered him sleeping next to her when she woke up.

¶ 6 Three days later, defendant told M.L. that the blood on his pants had not been "from some guy, it was from Jackie." Defendant told M.L. that he had run into Jackie at C.H.'s house and that they had gone to Estrella Park and gotten kicked out because it was too late. They had then gone to "the fishing hole," which M.L. described as a grassy knoll with trees and sand in the desert.[1] According to defendant, when Jackie started "making sexual advances" towards him, defendant had rebuffed her because she was a minor and because he had a girlfriend and was not interested. Jackie had yelled at him, and he had "snapped" and killed her. Defendant told M.L. that he had stabbed Jackie with a knife. He also told her that he had rolled Jackie's body in a carpet and burned her.

¶ 7 On October 4, M.L. told C.O. about defendant's confession, and C.O. drove M.L. to the Avondale Police Department that same day, where M.L. related defendant's statements to police. The police executed a search warrant on defendant's parents' residence and arrested defendant. While being placed under arrest, defendant stated that he "knew what was going on and . . . was cool with that." He also asked if the police were going to "tear up" his mother's house because of the warrant and advised that there was no need to do so because there was no evidence inside the house as he had already gotten rid of all of it.

¶ 8 In a video-taped interview with Avondale Police Detective Michael Sgrillo on October 5, defendant confessed to having killed Jackie, who was an acquaintance[2]. On the night of the murder, she had needed a ride home from a friend's house, and he had given her one. However, she had subsequently decided to accompany him to Estrella Park. Because the park was closing, they were asked to leave; and they had moved on to some cotton fields nearby.

¶ 9 According to defendant he had simply wanted to talk that night, but Jackie had wanted to have sex and had "kept coming on to [him]", so he just "snapped." He took a knife from his truck and stabbed her, first in the side of the neck, and then all over her body "lots of times." He also beat her with a stick. After he had killed her, he had tried to burn her, and had done so by siphoning gasoline from his truck. But parts of her had been left, so he had gone back the next day or so to see if someone had found her.

¶ 10 Defendant admitted to having had blood on his pants and to going to C.O.'s house after the killing and taking a shower. He also admitted telling C.O. and M.L. that night that he had gotten into a fight with someone over his truck. He informed Sgrillo that the police were not going to be able to find his clothes or the knife he had used because he had burned the former near his house and had thrown the latter into a canal.

¶ 11 Defendant then accompanied the police to the site of the murder and directed them to the remains of the victim's body wrapped in a piece of carpet hidden in some bushes. He stated that he had wanted to burn the rest of the remains, but had become concerned that some "transients living in the thick brush" would see him. He had therefore wrapped them in the carpet instead. He also identified the fire pit where he had burned some portions of the body and the stick with which he had beaten the victim.

¶ 12 Defendant stated that the sole person he had told about the killing was M.L. and then only because she had "hound[ed]" him about where he had been. He offered no justification for his actions, conceding only that they were "very wrong" and that he had "no explanation or excuse."

¶ 13 Defendant reiterated and expanded upon what he had told police in a press conference he held while in the Madison Street Jail. The state entered an audiotape of the conference into evidence at trial and played it for the jury during its case in chief.

1. The area was later described by police as a "farm field, cotton field area" abutting a river bottom with heavy brush.

2. A redacted version of the video tape was entered into evidence and given to the jury.

¶ 14 The state charged defendant with first degree murder, a class 1 dangerous felony, for the premeditated murder of the victim. The trial court also instructed the jury on second degree murder and manslaughter. Unable to reach a unanimous verdict on first degree murder, the jury found defendant guilty of second degree murder.

¶ 15 On December 7, 2001, the trial court sentenced defendant to an aggravated term of twenty-two years flat time in prison. Defendant timely appealed.

## ISSUES

¶ 16 Defendant raises two issues on appeal. (1) Did the trial court abuse its discretion in not permitting him to present evidence of third party culpability? (2) Did the trial court abuse its discretion in denying his request for a *Willits* instruction? [3]

## DISCUSSION

### (1) *Evidence of Third Party Culpability*

¶ 17 Throughout the trial, defendant sought to introduce evidence to suggest that someone other than he might have committed the crime. Specifically, defendant sought to introduce testimony that, on the night of the murder, P.S., with whom the victim had stayed from time to time, had seen M.H. and T.J. with injuries on their arms and had thought they had "acted suspicious." He also sought to introduce testimony that P.S. had informed Sgrillo that, roughly a month prior to her death, the victim had told her that she was pregnant with M.H.'s child. Additionally, he sought to introduce evidence that P.S. had provided police with the name of Mark H., who had told police in a taped interview that he had heard M.H. and T.J. make incriminating statements about their role in the victim's death.

¶ 18 A suitcase characterized as a "portable meth lab" was among the detritus at the scene of the crime. As part of his third party culpability argument, defendant there-

fore also sought to introduce evidence that M.H. had been found to have a "portable meth lab" in his car when he was allegedly arrested approximately one month after the murder.

¶ 19 P.S., M.H., T.J., and Mark H. did not testify at trial.[4] Instead, defendant attempted to introduce the victim's statements about pregnancy and P.S.'s comments about M.H.'s and T.J.'s possible involvement in the case via the testimony of Detective Sgrillo. The state argued that, despite defendant's assertions about M.H. and T.J., the evidence was not relevant as there was nothing linking either one or their actions to this particular crime. As to any testimony M.L. would offer about the victim's statements concerning pregnancy, the state contended that such evidence would also be hearsay not covered by any exception. The state made similar objections based on relevance and hearsay regarding defendant's questioning of Sgrillo.

¶ 20 The trial court excluded defendant's third party culpability evidence with regard to M.H. and T.J., "based on the lack of definiteness of the anticipated evidence and the unavailability of particular witnesses." It denied admission of M.L.'s testimony about pregnancy based on the state's hearsay objection. It also denied a motion to reconsider these decisions, albeit without prejudice.

¶ 21 Defendant also attempted to elicit testimony from Avondale Police Officer Raphael Fernandez about any role he might have played in the arrest of M.H. "sometime in November 2000" when a portable meth lab was allegedly found in his car. The trial court precluded the testimony, again based on lack of relevance.

¶ 22 Defendant maintains that the trial court's preclusion of the contested evidence of third party culpability was contrary to the recent holding of *State v. Gibson*, 202 Ariz. 321, 44 P.3d 1001 (2002), regarding the "relevance test" for the admissibility of such evidence and, therefore, erroneous. He argues

---

**3.** *See State v. Willits*, 96 Ariz. 184, 393 P.2d 274 (1964).

**4.** Despite serving subpoenas on P.S., M.H. and T.J., defendant did not call them as witnesses at

trial. Defendant located M.H. in custody at Durango and obtained a court order to transport him, yet still did not call him as a witness.

that we should reverse his conviction on this basis. We find this argument to be without merit.

¶ 23 We review the admission or exclusion of evidence for abuse of discretion. *State v. Tankersley*, 191 Ariz. 359, 369, 956 P.2d 486, 496 (1998) (citation omitted). This court "will not reverse the [trial] court's rulings on issues of the relevance and admissibility of evidence absent a clear abuse of its considerable discretion." *State v. Alatorre*, 191 Ariz. 208, 211, 953 P.2d 1261, 1264 (App. 1998) (citation omitted).

¶ 24 In *State v. Fulminante*, 161 Ariz. 237, 252, 778 P.2d 602, 617 (1989), our supreme court held that, before a defendant could "introduce evidence that another person may have committed the crime, the defendant must show that the evidence has an inherent tendency to connect such other person with the actual commission of the crime." In *Gibson*, that court commented upon the "inherent tendency" test enunciated in *Fulminante* and rejected it *to the extent that* it could be interpreted as putting the focus "on the *third party's* guilt" when considering the admissibility of such evidence. 202 Ariz. at 323, 44 P.3d at 1003. Instead, it "clarified" that the appropriate analysis of admissibility was found in "Rules 401, 402, and 403, Arizona Rules of Evidence." *Id.* Therefore, it reasoned, the proper inquiry was whether the proffered evidence was "relevant," i.e., whether it tended to make the existence of any fact of consequence to the determination of guilt more or less probable than it would be without that evidence. *Id.* (citing Ariz. R. Evid. 401). Thus, the court concluded that the "proper focus in determining relevancy" was "the effect the evidence has upon the *defendant's* culpability," and that "[t]o be relevant, the evidence need only *tend* to create a reasonable doubt as to the defendant's guilt." *Id.* at 324, 44 P.3d at 1004 (emphases in original). However, it further acknowledged that, to the extent that the *Fulminante* "clear link" standard really connoted no more than an "abbreviation for the conventional [401–403] balancing test," it presented no problems, so long as the same ruling would have been made "regardless of the nomenclature" adopted. *Id.* (quoting *People v. Primo*, 96 N.Y.2d 351, 728 N.Y.S.2d 735, 753 N.E.2d 164, 168 (2001)); *see also State v. Phillips*, 202 Ariz. 427, 46 P.3d 1048 (2002) (trial court reliance on *Fulminante* in excluding evidence not error where excluded evidence not relevant because it would not have exculpated defendant).

¶ 25 The trial court relied in part on *Fulminante* and *State v. Harrod*, 200 Ariz. 309, 26 P.3d 492 (2001) in concluding that defendant could not question M.L. about M.H.'s or T.J.'s possible involvement. As with most of the evidence, this would have constituted hearsay not falling under any permissible exception. *See State v. Hoskins*, 199 Ariz. 127, 143–44, ¶¶ 59–64, 14 P.3d 997, 1014–15 (2000) (applying hearsay rules to third party culpability evidence).

¶ 26 At the point defendant attempted the initial questioning of M.L., he still expected to call P.S. to testify at trial. Furthermore defendant made no showing as to why he did not call her or Mark H., M.H. or T.J. to testify. Thus the trial court did not abuse its discretion in excluding the evidence through other parties on the basis of hearsay objections. *Id. See also State v. Montano*, 136 Ariz. 605, 607–08, 667 P.2d 1320, 1322–23 (1983) (multiple hearsay not admissible unless hearsay exception applicable to each part).

¶ 27 Furthermore, the proffered evidence was excludable as "not relevant" under *Fulminante* and *Gibson* because it did not have a tendency to create a reasonable doubt as to defendant's guilt in this case. *Phillips*, 202 Ariz. at 434–35, ¶ 28, 46 P.3d at 1055–56. The fact that M.H. may have been found with a portable meth lab a month after the murder and that a portable meth lab was found at the scene of the murder did not make the existence of any fact of consequence to defendant's guilt more or less probable. There was evidence that "transients" and others frequented the murder site, and defendant himself told police that the meth lab found at the scene was there on the night of the murder. Nor was there any indication at trial that methamphetamine or its use had played any part in the murder.

¶ 28 Similarly, there was no indication that the victim's alleged pregnancy had played a role in the murder[5]. Because of P.S.'s statements, the state secured the victim's medical records prior to trial. These confirmed that the victim had had a pregnancy test and that it had been negative.

¶ 29 Defendant argued that the fact of her pregnancy was not being proffered for the truth of the matter asserted but rather as a statement for medical treatment pursuant to Ariz. R. Evid. 803(4) or for showing the victim's "existing state of mind" several weeks to a month prior to her murder. But clearly it was being offered to support the truth of the matter asserted to show that M.H. had had a motive to kill the victim; as were P.S.'s statements about her suspicions of M.H. and T.J. and her observation of their alleged injuries. As such, they were inadmissible hearsay. Ariz. R. Evid. 801(c), 802.

¶ 30 Furthermore, they had no tendency to raise a reasonable doubt about defendant's guilt. Other than P.S.'s assessment that they had acted "suspicious," there was no evidence that either M.H. or T.J. had been anywhere near the site of the murder on the night in question. Nor was there any evidence that the victim had struggled or fought: M.L. testified that, despite defendant's statements about a fight at a Circle K, she had seen no scratch marks or any signs of a fight on defendant when he came to take a shower. Furthermore, defendant's statement that his first act had been to stab the victim in the neck would tend to undermine the probability that an extended fight took place.[6]

¶ 31 Based on the record before us, we conclude that the proffered evidence was properly excluded by the trial court.[7] Nor do we find that defendant's constitutional arguments compel reversal.

¶ 32 First, as the state notes, defendant has waived these arguments by not raising them below. *See State v. Gendron,* 168 Ariz. 153, 154, 812 P.2d 626, 627 (1991) (absent fundamental error, failure to raise issue at trial waives it on appeal). However, even if not waived, they would be without merit.

¶ 33 Defendant maintains that the trial court's rulings deprived him of his rights to a fair trial and to present evidence under the Fourteenth and Sixth amendments of the United States Constitution. However, a defendant's constitutional rights are not violated where, as here, evidence has been properly excluded. *See, e.g., State v. Oliver,* 158 Ariz. 22, 30, 760 P.2d 1071, 1079 (1988) (Sixth Amendment right to present evidence limited to relevant evidence); *State v. LaGrand,* 153 Ariz. 21, 29, 734 P.2d 563, 571 (1987) (proper exclusion of hearsay evidence does not violate due process rights).

### (2) *Denial of Willits Instruction*

¶ 34 Defendant also argues that the trial court erred when it denied his request for a *Willits* instruction. Specifically, defendant argues that the state's failure to preserve the following items merited the instruction: (1) the carpet in which the victim's body was

---

5. The court allowed defendant to ask Avondale Police Officer Ybarra whether M.L. had mentioned anything about a pregnancy or blackmail. He testified that he recalled no mention of either and his report did not contain any reference to any such statements by M.L. Both the state and defendant questioned M.L. about whether defendant had ever told her that the victim had told him that she was pregnant and was claiming the child was his; M.L. denied that defendant ever made such statements to her or that she had made any such statements in an interview.

6. The medical examiner testified that the victim had had some "hair fragments" clenched in her right hand and that these had been there prior to the body being burnt. However, he also testified that it was impossible for him to determine how

they had gotten there: whether the victim had picked up the fragments from the general area or from her assailant, or whether they had gotten there from the general contraction that occurs when rigor mortis sets in.

7. We note that defendant was permitted to elicit testimony from Sgrillo that there still was an ongoing investigation and that M.H. and T.J. were the two "investigative leads" that the police were still pursuing. Thus part of defense counsel's closing argument was that the police had curtailed their investigation improvidently because of defendant's "alleged" confession and that they failed to investigate the matter thoroughly, specifically alluding to M.H.'s and T.J.'s possible involvement in the matter.

wrapped; (2) the suitcase constituting the "portable meth lab" and a gas container found at the scene; and (3) a taped interview of P.S.

¶ 35 "A *Willits* instruction is appropriate when the state destroys or loses evidence potentially helpful to the defendant." *State v. Murray,* 184 Ariz. 9, 33, 906 P.2d 542, 566 (1995) (citation omitted). However, "[d]estruction or nonretention [sic] of evidence does not automatically entitle a defendant to a *Willits* instruction." *Id.* To merit the instruction, a defendant must show "(1) that the state failed to preserve material and reasonably accessible evidence having a tendency to exonerate him, and (2) that this failure resulted in prejudice." *Id.* (citation omitted).

¶ 36 This court reviews a trial court's decision to grant or deny a *Willits* instruction for an abuse of discretion. *Id.* We find no abuse of discretion in the trial court's denial of the instruction in this case.

¶ 37 Evidence must possess exculpatory value that is apparent before it is destroyed. *See State v. Walters,* 155 Ariz. 548, 551, 748 P.2d 777, 780 (App.1987). Furthermore, in general, the state does not have a duty to seek out or preserve potentially exculpatory evidence for the defendant when they have developed sufficient evidence against him. *Id.*

¶ 38 Here, defendant readily admitted to police and to the press that he had wrapped the victim's body in a carpet at the scene of the crime. Likewise, defendant maintained that he had siphoned the gasoline from his truck into a cup to burn the body. Therefore, there was no reason to believe that either the carpet or the gasoline container would necessarily have produced exculpatory evidence. The same is true of the "portable meth lab," as there was nothing to connect it to the murder. Defendant's contentions that these items might have produced potentially exculpatory evidence, such as fingerprints, is sheer speculation at best.

¶ 39 As to the tape of P.S.'s interview, the record contains evidence that the state gave a copy of it to defense counsel on January 19, 2001. Defense counsel did not contest the fact that this was so. The fact that defendant misplaced the tape did not mandate a *Willits* instruction based on the state's "destruction" of evidence. Furthermore, for reasons stated above, there was no showing that the evidence contained in the taped interview would have exonerated defendant. Therefore, it is difficult to see how its absence prejudiced him.

## CONCLUSION

¶ 40 For the foregoing reasons, we affirm defendant's conviction and sentence.

CONCURRING: WILLIAM F. GARBARINO, Presiding Judge, and SUSAN A. EHRLICH, Judge.